GEORGIANNA WHITE, Appellant, v. M. M. MASSEE et al., Appellees.

**INJUNCTION:** Subjects of Relief—Interference With Performance of Contract—Conditions. One who is not in default on her contract with her father to care for him and at his death to have certain property in return for such care, may have a permanent injunction which will restrain others from *interfering and preventing performance* of the contract; but, to meet exceptional circumstances which arise out of an unseemly controversy over the father's property, the court may, *notwithstanding the strict legal rights of the parties*, impose conditions which will insure right conduct on the part of plaintiff and protect the father.

**CONTRACTS:** Rescission—Technical Breach. Principle reaffirmed that a purely technical and non-substantial breach of a contract affords no proper grounds for a rescission.

Headnote 1:  32 C. J. p. 229; 40 Cyc. p. 1071 (Anno.)  **Headnote 2:**
9 C. J. p. 1181.

Headnote 2:  6 R. C. L. 926.

*Appeal from Chickasaw District Court.*—W. J. SPRINGER, Judge.

### JANUARY 18, 1927.

Suit to enjoin interference with plaintiff in carrying out
her contract with defendant M. M. Massee, her father, to furnish
him a home, and with her possession of land given her by him,
and to cancel deeds by M. M. Massee to Seymour Massee and
Clifford Massee. Cross-petition to cancel agreement and to re-
cover rents. Decree for defendants. Plaintiff appeals.—*Re-
versed.*

*H. J. Fitzgerald* and *W. H. Scott,* for appellant.

*Geiser & Donohue,* for appellees.

MORLING, J.—I. Plaintiff and defendant Seymour Massee
are the children, and Clifford Massee the grandson, of defendant
M. M. Massee. About July 18, 1920, plaintiff and her father

1. INJUNCTION: orally agreed that plaintiff should furnish a
subjects of re-
lief: interference home for, take care of, and treat her father
with perform-
ance of con- properly, and that he should give her his 160-
tract: conditions. acre farm (he says 80 acres) when he was
through with it. It was agreed that the plaintiff and her hus-
band and the father should move upon the land, and that the
place should be fixed up. Plaintiff was to pay the taxes and
insurance. They did move upon the land. Plaintiff's husband
made improvements and repairs. The father fixed over and
improved the house. No trouble developed until July, 1923.
About that time, the father demanded rent. Defendants' testi-
mony is that the plaintiff promised, as a part of the agreement
of 1920, to pay rent. Plaintiff and her husband testified that
there was no agreement to pay rent. At least three other wit-
nesses testified to statements by defendant M. M. Massee that he
had given the farm to the plaintiff, and that all they had to do
was to keep up the taxes and insurance (other than taking care
of him, of course). Ten other witnesses testified to statements

made by the father that he had given the farm to the plaintiff. The father testified that he then had other property and money amounting to about $2,200. The evidence shows very satisfactorily that the agreement was as claimed by plaintiff, and that there was no agreement that plaintiff should pay rent.

II.　Defendants contend that plaintiff did not treat her father properly. The father testified, in substance, that the plaintiff furnished him nothing in the way of clothing; that they treated him "very fair before;" that plaintiff and her husband tried to tell him that he was insane; that the boy set him down in a chair, and told him to stay there; that plaintiff's husband choked him (he retracted this) and snubbed his nose; that plaintiff hit him over the eye. On cross-examination, he testified:

"White didn't treat me exactly right. * * * she treated me very good, and pled poverty all the while. Q. Did White treat you good? A. Not very good. Q. Did the son Matthew treat you good? A. Not very good. The granddaughter, the little girl, Harriet, shaved me. * * * Mrs. White sure hit me. Q. And you say that was the reason you left? A. Why, I wasn't going to tell. Q. What is the reason you left? A. I didn't like the way they did business. When I came there, they used up my lumber. * * * Q. You have nothing against your daughter now? A. I am sure I never bother them. * * * They went away and left me alone lots of times, and at night, except the little girl there. She was an awfully good little girl, but I don't think they used her any better than they did me."

The foregoing is the trend of the father's testimony. He was 85 years old when testifying, in 1923. He was evidently fickle, vacillating, and irascible. There are serious contradictions in his testimony. He told a number of witnesses, about the time he went to live with plaintiff, that the defendant Seymour, with whom he had been living, had kicked him out. The testimony of the plaintiff and members of her family is that the father was treated kindly by them; that he made no complaints, and said he was well satisfied. The testimony of other witnesses tends to corroborate plaintiff's claim in this respect. Without further detailing the evidence pro and con, we are satisfied that, while the father was irritable, and frequently flew into a rage,

and, it is not unlikely, provoked retort, that his claims to having been abused or ill treated are not sustained.

III.  The father claims to have paid some taxes and insurance assessments.  The evidence fails to show, however, that the plaintiff was not ready and willing to pay the taxes and insurance, or that she has broken her contract in this or any other respect.

IV.  Prior to July, 1920, the father, who was a widower, had lived most of the time since his wife's death with the defendant Seymour Massee.  About that time, he left Seymour, and gave as his reason, and the evidence abundantly shows, that Seymour and his wife refused to keep him any longer.  Two of the neighbors testified that the father said that Seymour's wife had asked him to deed the farm in controversy to them, and he had refused to do so.  After leaving plaintiff, the father went back to Seymour's place.  This was about July 18, 1923.  On October 10, 1923, the father deeded to Seymour 120 acres of the land in question, and to Seymour's son, the defendant Clifford, the other 40 acres.  These deeds were recorded.  The plaintiff testified that, when the agreement in question was made, the father told her that he would make a will by which she would be given the farm.  A will was later drawn by Getsch, a banker, who had been looking after the father's business.  The banker testified that Seymour Massee got this will in the summer of 1923.  The will was not produced.  The banker testified, over objection, that the will gave the real estate to plaintiff.  The father testified:

"I ain't obliged to tell if I deeded any property away or not.  I have nothing now but a little money.  A couple or $3.00.  No real estate.  I ain't a-going to tell you who I gave the real estate to."

The consideration named in the deeds is love and affection "and other considerations."  Plaintiff was and still is in possession.  Counsel, of course, admit that the grantees are not bona-fide purchasers.  The circumstances, however, are important, as bearing on the question whether plaintiff should have an injunction.

Defendants' main contention is that plaintiff's agreement is one for continuing personal services, not specifically enforcible against her, and therefore not mutual, and also, until

completely performed by plaintiff, not subject to specific performance; that the suit for injunction is, in effect, for negative specific performance, and therefore cannot be maintained.   The plaintiff is not now entitled to specific performance, nor does she claim that she is, either positively or negatively.   Her suit is for an injunction restraining the defendants from interfering with or preventing her from performing her contract.   Though she is not, at this stage of the case, entitled to specific performance, either positively or negatively, she is entitled to maintain a suit on the principle of *quia timet,* to preserve her rights in the contract and property, and to protect her in performance, to the end that she may ultimately be in a position to claim and secure the benefits of the contract.   *Chantland v. Sherman,* 148 Iowa 352, and cases cited; *Newman v. French,* 138 Iowa 482; *Campbell v. Dunkelberger,* 172 Iowa 385.   After the death of M. M. Massee, the plaintiff, if she has performed her contract, and it is still in effect, may enforce it by fastening a trust upon the property.   She may also maintain an action at law for breach. She may sue for services and for improvements made.   40 Cyc. 1070.   The defendants, before the commencement of this action, gave the plaintiff and her husband notice to quit.   The plaintiff may hold herself in continued readiness to perform her contract with her father, and upon his death may thereby, as against the other parties, become entitled to one of the remedies referred to. Yet, if the deeds to Seymour and Clifford are allowed to stand, and the grantees are not prevented from exercising their apparent rights as record owners of the legal title, the remedy chosen by plaintiff may become wholly unavailing.   Plaintiff does not claim that she is entitled now to specific performance. It is said in her argument in reply:

"She is only asking that she be permitted to do that which she has agreed to do.   When this has been accomplished, she will then have the burden of proving that she has complied with the terms of her agreement."

We are of the opinion that the plaintiff had, up to the time of trial, fully performed her contract (or held herself in readiness to perform), and that the payment of taxes and insurance premiums by the father was not occasioned by any refusal of the plaintiff's to pay them.   If plaintiff were in default in these respects, the

2. CONTRACTS:
   rescission:
   technical breach.

default is not such as to entitle the father to a rescission. Rescission or cancellation will not be granted for a mere breach not so substantial and fundamental as to defeat the object of the parties in making the agreement. *Mintle v. Sylvester,* 202 Iowa 1128; *Brainard v. Holsaple,* 4 G. Greene 485; *Leonard v. Smith,* 80 Iowa 194; *Dille v. Longwell,* 169 Iowa 686; *Freeth v. Burr,* L. R. 9 C. P. 208; *McAllister-Coman Co. v. Matthews,* 167 Ala. 361 (140 Am. St. 43, 52 So. 416); *Brady v. Oliver,* 125 Tenn. 595 (147 S. W. 1135, 1139, 41 L. R. A. [N. S.] 60, Ann. Cas. 1913C 376); *Fay v. Oliver,* 20 Vt. 118 (49 Am. Dec. 764, 767); *Newell v. E. B. & A. L. Stone Co.,* 181 Cal. 385 (184 Pac. 659); *St. Regis Paper Co. v. Santa Clara Lbr. Co.,* 186 N. Y. 89 (78 N. E. 701); *Harper v. Battle,* 180 N. C. 375. (104 S. E. 658); 9 Corpus Juris 1181. We pass the question whether Seymour and Clifford Massee might, in any event, rescind the contract of M. M. Massee (which they are attempting to do), nor do we determine what, if anything, is owed by plaintiff for taxes and insurance premiums paid by defendants. These matters are not directly in issue, and may be determined when the plaintiff seeks her final remedy. The defendants are entitled to nothing on their cross-petition. The plaintiff is entitled to permanent injunction restraining the defendants from interfering with or preventing her from carrying out her contract and from removing her from the premises (so long as she performs, or is in readiness to perform, on her part), and until such time as she may, by proper proceedings, proceed for the enforcement of her rights and with her remedies on the contract. The plaintiff, however, is in a court of equity. The case calls for the application of the equitable maxim, "He who asks equity must do equity." Although plaintiff's contract with her father is in force, it is within the province of such court, as a condition to granting her relief, to make it conditional upon her observing the requirements of conscience and of righteous conduct, even though this is not demanded by cross-bill. The defendant finds himself in a most unfortunate condition, regardless of whether his son or his daughter wins this deplorable controversy. He is now past 88 years old. He has upon him the infirmities of age, as well as of temperament, previously noted. The plaintiff and the defendant Seymour Massee, before the making of the agreement under consideration, had each received from the father

and mother 115 acres of land. The father has parted with his entire means of support. His son, the defendant Seymour, testified:

"Before taking the deed to the 120, I went up and asked Mrs. White as to why she was there * * * Don't know as I did take this deed without ascertaining what her rights were. I went up there, and she said, if they couldn't stay in peace with him, they would get off. She said in that conversation she would do just as she agreed. * * * Q. Didn't your father pay for any lumber on that farm [Seymour's] since you went there? A. I say he could if he wanted to. * * * I know my wife told Harry White [plaintiff's son] to come and get father. Q. She said she didn't want him there any more? A. She told him he had better have Mrs. White come and get her father and take care of him for a while. Q. She told him she talked to him as long as she was going to? A. She might. Q. You people at that time were tired of the old man? A. Not any tireder than the Whites got. * * * We didn't care about keeping him always. * * * I told him to go."

It may be that, by the strict terms of the agreement, and according to the understanding, the plaintiff was only required to furnish her father a home and take care of him on the farm which he agreed to give her. Her husband testified:

"We were to treat him reasonable, and give him whatever he asked for."

Plaintiff testified:

"We furnished him care, support, and maintenance, and everything he needed, as far as we knew. * * * I told him that I wanted him to come back. * * * The last of December or the first of January, I noticed a change in his mental condition."

Plaintiff's husband admitted that about $5.00 per acre is a reasonable rent for the land. The father is justly entitled to the affectionate care of his children. Owing to the unfortunate breach with plaintiff, he may find it morally impossible to return to her home. It is evident from past experience that the son and his wife might refuse to take care of him. The court, in imposing conditions to the granting of equitable relief, is not restrained by the strict legal rights of the parties, but may impose such terms as are demanded by justice and regard for righteous conduct. See 21 Corpus Juris 667. We are of the

opinion that, as a condition to the issuance of the injunction, the plaintiff should be required to pay into the office of the clerk of the court from which the injunction issues, for the use of the father, $2,400, as rent to March 1, 1927, and that thereafter yearly, during the life of her father, as a condition to the continuance of the injunction, she should in like manner pay for his use the sum of $800. The plaintiff may at her election have decree in this court, or have the case remanded for decree in the district court.

The judgment is—*Reversed.*

EVANS, C. J., and DE GRAFF and ALBERT, JJ., concur.